IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| TRIDENTIS, LLC, | ) |
| *Plaintiff*, | ) ) ) ) |
| v. | ) Civil Action No. 1:23-cv-97 |
| CITY OF ALEXANDRIA, | ) ) ) |
| *Defendant*. | ) |

**[PROPOSED] BRIEF OF AMICUS CURIAE THE COMMONWEALTH OF VIRGINIA**

JASON S. MIYARES
   *Attorney General*

STEVEN G. POPPS (VSB #80817)
   *Deputy Attorney General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7704 – Telephone
(804) 371-0200 – Facsimile
AFerguson@oag.state.va.us

ANDREW N. FERGUSON (VSB #86583)
   *Solicitor General*

ERIKA L. MALEY (VSB #97533)
   *Principal Deputy Solicitor General*

KEVIN M. GALLAGHER (VSB #87548)
   *Deputy Solicitor General*

ANNIE CHIANG (VSB #94703)
   *Assistant Solicitor General*

*Counsel for Amicus Curiae Commonwealth of Virginia*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

IDENTITY AND INTERESTS OF AMICUS CURIAE ............................................................ 2

BACKGROUND ........................................................................................................................ 2

ARGUMENT .............................................................................................................................. 3

    I.    The City of Alexandria has no compelling government interest to justify naked discrimination on the basis of race......................................................................................... 4

    II.   Even if the City had a compelling government interest, the Program is not narrowly tailored ............................................................................................................................ 8

CONCLUSION............................................................................................................................ 10

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adarand Constructors, Inc. v. Pena*,
   515 U.S. 200 (1995) ........................................................................................................ 1, 2, 4

*Alexander v. Estepp*,
   95 F.3d 312 (4th Cir. 1996) ..................................................................................................... 4

*City of Richmond v. J.A. Croson Co.*,
   488 U.S. 469 (1989) ........................................................................................... 5, 6, 9, 10

*Contractors Ass'n of E. Pa., Inc. v. City of Phila.*,
   91 F.3d 586 (3d Cir. 1996) ..................................................................................................... 6, 7

*Doe v. Rector & Visitors of George Mason Univ.*,
   132 F. Supp. 3d 712 (E.D. Va. 2015) ..................................................................................... 8

*Grutter v. Bollinger*,
   539 U.S. 306 .................................................................................................................. 2, 9, 10

*H.B. Rowe Co. v. Tippett*,
   615 F.3d 233 (4th Cir. 2010) ............................................................................................. 6, 8, 9

*Miller v. Johnson*,
   515 U.S. 900 (1995) ........................................................................................................ 3, 4, 5

*Palmore v. Sidoti*,
   466 U.S. 429 (1984) ................................................................................................................. 3

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
   551 U.S. 701 (2007) .......................................................................................................... 7, 10

*Schilling v. Bedford Cnty. Mem'l Hosp., Inc.*,
   225 Va. 539 (1983) .................................................................................................................. 8

*Shaw v. Hunt*,
   517 U.S. 899 (1996) .................................................................................................................. 6

*Shaw v. Reno*,
   509 U.S. 630 (1993) ........................................................................................................ 3, 4, 5, 9

*United States v. Barber*,
   80 F.3d 964 (4th Cir. 1996) ..................................................................................................... 6

*Vitolo v. Guzman*,
    999 F.3d 353 (6th Cir. 2021) ...................................................................................6

*Widmar v. Vincent*,
    454 U.S. 263 (1981)..................................................................................................8

*Window Rock Unified Sch. Dist. v. Reeves*,
    861 F.3d 894 (9th Cir. 2017) ...................................................................................8

**Statutes**

Alexandria Human Rights Code, ch. 4 ...................................................................................7

Va. Code §§ 2.2-3900–2.2-3908..............................................................................................7

**Constitution**

Declaration of Independence ................................................................................................10

Va. Const. art. I, § 11 ..............................................................................................................7

**Other Authorities**

Emily Leayman, *Minority-Owned Small Business Grant Program Launched in
    Alexandria*, Patch (Jan. 11, 2023), https://tinyurl.com/yychwhwu............................2

Attorney General, *Attorney General Miyares Launches Civil Rights Investigation
    into Thomas Jefferson High School for Science and Technology* (Jan. 4, 2023),
    https://tinyurl.com/mv9fyw7c...................................................................................7

# INTRODUCTION

It is difficult to conceive a more blatant violation of the Equal Protection Clause than the City of Alexandria's BIPOC Small Business Grant Program (the Program). The Program parcels out public money expressly on the basis of skin color, granting money to members of preferred racial groups and denying it to all others. To be eligible for the Program, a business must demonstrate that at least 51% of its owners are "minorities," which the City defines as Black or African American, Hispanic American, Asian American, or Indigenous or Native American.[1] According to the City, White Alexandrians and Alexandrians of Arab or Middle Eastern descent need not apply.

*Any* individual "suffers an injury when he or she is disadvantaged by the government because of his or her race, whatever that race may be." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 230 (1995). By designing the Program to grant money on the basis of an applicant's race, the City of Alexandria has committed a wanton act of intentional racial discrimination and injured Tridentis and every other business whose owners are not members of the City's preferred racial groups. And, as the Supreme Court has repeatedly held, "[a] free people whose institutions are founded upon the doctrine of equality should tolerate no retreat from the principle that government may treat people differently because of their race only for the most compelling reasons." *Id.* at 227 (quoting *Hirabayashi v. United States*, 320 U.S. 81 (1943)). Because the City's discrimination is not narrowly tailored to a compelling state interest—in fact, the Program runs afoul of the Commonwealth's interest, expressed in its constitution, of forbidding all racial discrimination—the City's conduct violates the Equal Protection Clause.

---

[1] The City's documents explaining the Program also describe these types of business owners as "Black, Indigenous and people of color ('BIPOC')." See, *e.g.*, ECF No. 3-3 at 1. This brief uses the term "minority" and "BIPOC" interchangeably just as the City does.

1

When local action is at issue, "only a social emergency rising to the level of imminent danger to life and limb can justify racial discrimination." *Grutter v. Bollinger*, 539 U.S. 306, 353 (Thomas, J., concurring in part and dissenting in part) (quoting *Adarand*, 515 U.S. at 240 (Scalia, J., concurring in the judgment)). The Program is not addressed to an emergency; it is an explicitly racist business-development program. This Court therefore should grant Tridentis's request for a preliminary injunction and enjoin the launch of the Program.

## IDENTITY AND INTERESTS OF AMICUS CURIAE

The Commonwealth of Virginia, represented by its Attorney General, has an interest in preserving the rights of all its citizens to the equal protection of the laws, ensuring that local entities comply with federal law, and providing for citizens and local businesses equal opportunities to share equally in public benefits for which they qualify. The City of Alexandria's policy intentionally discriminates on the basis of race in violation of the basic constitutional guarantee of equal treatment without regard to race or color, and therefore undermines these interests.

## BACKGROUND

Last month, the City of Alexandria, Virginia announced the Alexandria BIPOC Small Business Grant Program. Emily Leayman, *Minority-Owned Small Business Grant Program Launched in Alexandria*, Patch (Jan. 11, 2023), https://tinyurl.com/yychwhwu. The Program "is an initiative providing grants to qualifying Black, Indigenous and people of color ('BIPOC') owned small local businesses that enable the City to retain and grow existing businesses, and/or assist with start-up activities." ECF No. 3-3 at 1. It offers grants to only businesses owned by "[m]inority individual[s]"—individuals who are citizens of the United States or a legal resident alien and who fit into one of four categories: "Black or African American," "Asian American," "Hispanic American," or "Indigenous or Native American." ECF No. 3-4 at 2–3; ECF No. 3-7 at

2

7–8. Specifically, applicants to the Program must "[d]emonstrate 51% BIPOC ownership" by "provid[ing] % ownership and names of the BIPOC owners." ECF No. 3-3 at 6; see also ECF No. 3-5 at 2 ("encourag[ing]" applicants "to gather . . . [d]ocumentation of 51% BIPOC ownership" including "the percentage of BIPOC ownership and names of BIPOC owners" "before beginning the application"). In other words, eligibility for participation in the Program turns on the business owners' membership in particular racial groups. Any business with 51% ownership outside of the preferred racial groups is excluded from participating in the Program and is ineligible for any of the cash grants under the Program.

Plaintiff Tridentis, LLC is a for-profit business based in Alexandria, Virginia, which provides professional engineering, logistics, and program management services. ECF No. 3-8 ¶¶ 3, 6–7. David K. Jochum, the owner of Tridentis, resides in the City of Alexandria and is "white." *Id.* ¶¶ 5, 16. Tridentis is ready and able to apply for a grant under the Program, *id.* ¶ 14, and would be eligible for a grant but-for the fact that Jochum is not a member of any of the Program's preferred racial groups, *id.* ¶¶ 2–4, 5–8, 10, 12.

## ARGUMENT

"Classifications of citizens solely on the basis of race 'are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.'" *Shaw v. Reno*, 509 U.S. 630, 643 (1993) (quoting *Hirabayashi*, 320 U.S. at 100). Thus, the "central purpose" of the Equal Protection Clause is to prevent government actors "from purposefully discriminating between individuals on the basis of race," *id.* at 642, and the "central mandate" of the Clause is "racial neutrality in governmental decisionmaking," *Miller v. Johnson*, 515 U.S. 900, 904 (1995); see also *Palmore v. Sidoti*, 466 U.S. 429, 432 (1984) ("A core purpose of the Fourteenth Amendment was to do away with all governmentally imposed discrimination based on race."). Laws that "explicitly

3

distinguish between individuals on racial grounds" fall within the "core of that prohibition." *Shaw*, 509 U.S. at 642. The prohibition "obtains with equal force regardless of the race of those burdened or benefited by a particular classification." *Miller*, 515 U.S. at 904 (quotation marks omitted); see also *Adarand*, 515 U.S. at 229–30 ("[W]henever the government treats any person unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection.").

"Express racial classifications"—like the one created by the City of Alexandria's BIPOC Small Business Grant Program—are "immediately suspect because, absent searching judicial inquiry, there is simply no way of determining what classifications are 'benign' or 'remedial' and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics." *Shaw*, 509 U.S. at 642–43 (cleaned up). Accordingly, the Supreme Court has held that "the Fourteenth Amendment requires state legislation that expressly distinguishes among citizens because of their race to be narrowly tailored to further a compelling governmental interest." *Id.* at 643. Put another way, "any person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." *Adarand*, 515 U.S. at 224. Only "the *most* exact connection between justification and classification" will do. *Alexander v. Estepp*, 95 F.3d 312, 315 (4th Cir. 1996) (emphasis added) (quoting *Adarand*, 515 U.S. at 236).

Here, the City of Alexandria cannot show that its BIPOC Small Business Grant Program furthers a compelling government interest or, even if it did, that it is narrowly tailored to any such interest.

I. **The City of Alexandria has no compelling government interest to justify naked discrimination on the basis of race**

The BIPOC Small Business Program fails at the first step—Alexandria cannot provide a

4

viable compelling government interest to justify its racial classification. In announcing the program, the City contended that the Program was necessary because the COVID-19 pandemic imposed many hardships on businesses, "particularly felt by . . . [minority-]owned businesses due to structural barriers and discriminatory financial lending practices." ECF No. 3-7 at 4. It is unclear whether the City is identifying *its own* past discrimination or a more general social discrimination experienced by members of the Program's preferred racial groups. Neither would justify the City's facially discriminatory Program.

Remedying the present effects of past government discrimination can qualify as a compelling interest for the strict-scrutiny inquiry. *Shaw*, 509 U.S. at 656. But the government may not invoke this interest with "a generalized assertion that there has been past discrimination" inflicted by state action, because such a statement "provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 498 (1989). Instead, the government must provide "a strong basis in evidence of the" present effects of past government discrimination "being remedied." *Miller*, 515 U.S. at 922. In *Croson*, for example, the Supreme Court rejected the City of Richmond's reliance on a "highly conclusionary statement . . . that there was racial discrimination in the construction industry 'in this area, and the State, and around the nation'" as of "little probative value in establishing identified discrimination" in the particular industry in the particular locale. 488 U.S. at 500. Rather, the City "must identify that discrimination . . . with some specificity before [it] may use race-conscious relief" and have a "strong basis in evidence for its conclusion that remedial action is necessary." *Id.* at 500, 504.

Here, the City falls well short of the mark. The City gestures at COVID-19's general effects on businesses and "structural barriers and discriminatory financial lending practices" to justify the

5

Program. But it has not identified any government conduct which allegedly imposed those "barriers," nor any governmental policy which required or even encouraged "discriminatory lending practices." Nor has it even tried to demonstrate the present effects of any discriminatory conduct, public or private. It has not, for example, demonstrated "a significant statistical disparity" of lending practices between minority- and non-minority-owned businesses. See *H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 241, 243–44 (4th Cir. 2010) (cleaned up). The City's generalized assertion of past discrimination alone "is not probative of any discrimination in the *local*" level. *Croson*, 488 U.S. at 503 (emphasis added).

Insofar that the City proposes to remedy general societal discrimination, the Program's unconstitutionality is even more obvious. Remedying general societal discrimination categorically is not a compelling interest justifying race-based decision-making. See *Shaw v. Hunt*, 517 U.S. 899, 909–10 (1996) ("[A]n effort to alleviate the effects of societal discrimination is not a compelling interest."); *United States v. Barber*, 80 F.3d 964, 969 (4th Cir. 1996) ("To effectively ensure . . . equal protection generally, courts must focus remedies on specific racial prejudice, rather than on the effects of past societal discrimination." (cleaned up)); *cf. Croson*, 488 U.S. at 505 ("To accept [the government]'s claim that past societal discrimination alone can serve as the basis for rigid racial preferences would be to open the door to competing claims for 'remedial relief' for every disadvantaged group."). The government's interest in remedying the past effects of its own discrimination does not extend to remedying the past effects of private, societal discrimination unless the government "had a hand in the past discrimination it now seeks to remedy." *Vitolo v. Guzman*, 999 F.3d 353, 361 (6th Cir. 2021). Unless the government "actively or passively participated in this past discrimination, race-based remedial measures violate equal-protection principles." *Ibid.*; see also *Contractors Ass'n of E. Pa., Inc. v. City of Philadelphia*, 91

6

F.3d 586, 596 (3d Cir. 1996) ("The municipality has a compelling state interest that can justify race-based preferences only when it has acted to remedy identified present or past discrimination in which it engaged or was a 'passive participant;' race-based preferences cannot be justified by reference to past 'societal' discrimination in which the municipality played no material role."). At no point has the City contended that it participated in the "structural barriers" or "discriminatory lending practices" which it claims the Program is designed to remedy.

To be sure, the City and the Commonwealth share an overwhelming interest in rooting out and destroying racial discrimination. Office of the Attorney General, *Attorney General Miyares Launches Civil Rights Investigation into Thomas Jefferson High School for Science and Technology* (Jan. 4, 2023), https://tinyurl.com/mv9fyw7c. And both Alexandria and the Commonwealth have enacted laws forbidding and punishing racial discrimination. See, *e.g.*, Va. Code §§ 2.2-3900–2.2-3908; Alexandria Human Rights Code, ch. 4, sec. 12-4-1–12-4-30. But racial discrimination will not be defeated by more racial discrimination. "The way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007). If the City wants to fight racial discrimination, it should punish those who discriminate on the basis of race, rather than denying its citizens government benefits on the basis of their skin color.

Even if in the course of this litigation the City attempts to recast its interests, it cannot possibly have a compelling state interest in its racial classification because the Virginia Constitution expressly rejects the argument that such classifications are compelling in the Commonwealth of Virginia. The Virginia Constitution recognizes its citizens' "right to be free from any governmental discrimination upon the basis of . . . race." Va. Const. art. I, § 11. The Virginia Supreme Court has treated the Virginia Constitution's equal rights provision as

7

"coextensive with the federal Equal Protection Clause." *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712, 735 (E.D. Va. 2015) (citing *Archer v. Mayes*, 213 Va. 633 (1973)); see also *Schilling v. Bedford Cnty. Mem'l Hosp., Inc.*, 225 Va. 539, 543 n.2 (1983) (explaining that the "analysis is the same under both provisions"). Thus, just as the City's conduct violates the Equal Protection Clause, it violates the Virginia Constitution. The City has a compelling interest in complying with the Commonwealth's Constitution. See, *e.g.*, *Widmar v. Vincent*, 454 U.S. 263, 275 (1981) ("We agree that the interest of the [defendant] in complying with its constitutional obligations may be characterized as compelling."); *Window Rock Unified Sch. Dist. v. Reeves*, 861 F.3d 894, 917 (9th Cir. 2017) ("It cannot be questioned that [a State] has a compelling interest in complying with its statutory and state constitutional mandate."). But it certainly has no interest at all in violating it. Accordingly, this Court should find that the City has failed to, and cannot, show the Program vindicates a compelling interest sufficient to justify its facial discrimination on the basis of race.

## II. Even if the City had a compelling government interest, the Program is not narrowly tailored

Even if the City could adequately provide a strong basis in evidence that remedial action is necessary to remedy the present effects of past discrimination undertaken by the City itself, the Program would still violate the Equal Protection Clause because it is not narrowly tailored to that purported interest. The Fourth Circuit has identified several factors relevant in evaluating whether a government policy is narrowly tailored:

> (1) the necessity of the policy and the efficacy of alternative race neutral policies; (2) the planned duration of the policy; (3) the relationship between the numerical goal and the percentage of minority group members in the relevant population; (4) the flexibility of the policy, including the provision of waivers if the goal cannot be met; and (5) the burden of the policy on innocent third parties.

*Tippett*, 615 F.3d at 252. It also "consider[s] a program's 'overinclusiveness,' [such as] its

8

tendency to benefit particular minority groups that have not been shown to have suffered invidious discrimination." *Ibid.* (quotation marks omitted).

The City of Alexandria has not explained how it can meet any of these factors—let alone all of them—although two warrant specific mention. First, "there does not appear to have been any consideration of the use of race-neutral means to increase minority business participation" in the City of Alexandria's economy. *Croson*, 488 U.S. at 507. While the City "need not exhaust every conceivable race-neutral alternative," the means-ends fit "*requires* serious, good faith consideration of workable race-neutral alternatives." *Tippett*, 615 F.3d at 252 (emphasis added). Second, rather than identify discrimination *specifically* felt by each minority group it proports to support with the Program, the City "random[ly] inclu[des] . . . racial groups that, as a practical matter" have had *very* different experiences in both Virginia's and our nation's history. *Croson*, 488 U.S. at 506. The Program's indiscriminately broad sweep or "gross[] overinclusive[ness] strongly impugns [its] claim of remedial motivation." *Ibid.*; *supra* 8–9. The City has not narrowly tailored its policy to its identified compelling interest.

\*   \*   \*

"Racial classifications of any sort pose the risk of lasting harm to our society." *Shaw*, 509 U.S. at 657; see also *Grutter*, 539 U.S. at 353 (Thomas, J., concurring in part and dissenting in part) ("The Constitution abhors classifications based on race."). Such classifications "reinforce the belief, held by too many for too much of our history, that individuals should be judged by the color of their skin." *Shaw*, 509 U.S. at 657; see also *Croson*, 488 U.S. at 520 (Scalia, J., concurring in the judgment) ("[D]iscrimination on the basis of race is illegal, immoral, unconstitutional, inherently wrong, and destructive of democratic society." (quoting A. Bickel, *The Morality of Consent* 133 (1975))).

9

The foundational principle of our diverse society is the "self-evident" truth "that all men are created equal." Declaration of Independence para. 2. We have not always lived according to that principle; indeed, we have at times fallen woefully short of guaranteeing equality before the law. But two wrongs do not make a right. We will not end racial discrimination by promoting racial discrimination.

"[E]very time the government places citizens on racial registers and makes race relevant to the provision of burdens or benefits, it demeans us all." *Grutter*, 539 U.S. at 353 (Thomas, J., concurring in part and dissenting in part). Denying government benefits on the basis of race "is precisely the sort of government action that pits the races against one another, exacerbates racial tension, and provoke[s] resentment among those who believe that they have been wronged by the government's use of race." *Parents Involved*, 551 U.S. at 759 (Thomas, J. concurring) (cleaned up). Even "benign" racial classifications—like the one the City of Alexandria has created through the BIPOC Small Business Grant Program—"have individual victims, whose very real injustice we ignore whenever we deny them enforcement of their right not to be disadvantaged on the basis of race." *Croson*, 488 U.S. at 527 (Scalia, J., concurring in the judgment).

This Court should accordingly find that Tridentis is likely to succeed on the merits because the Program violates the Fourteenth Amendment.

## CONCLUSION

For the foregoing reasons, this Court should grant Tridentis's motion for a preliminary injunction and enjoin the City from carrying out its unconstitutionally discriminatory policy under the Program.

Dated: February 13, 2023  Respectfully submitted,

By:  */s/ Andrew N. Ferguson*
   Andrew N. Ferguson (VSB #86583)
   *Solicitor General*

JASON S. MIYARES   ERIKA L. MALEY (VSB #97533)
   *Attorney General*      *Principal Deputy Solicitor General*

STEVEN G. POPPS (VSB #80817)   KEVIN M. GALLAGHER (VSB #87548)
   *Deputy Attorney General*      *Deputy Solicitor General*

   ANNIE CHIANG (VSB #94703)
      *Assistant Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7704 – Telephone
(804) 371-0200 – Facsimile
AFerguson@oag.state.va.us

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that on February 13, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all parties of record.

                                                        */s/ Andrew N. Ferguson*
                                                  Andrew N. Ferguson (VSB #86583)
                                                  *Counsel for Amicus Curiae Commonwealth of Virginia*

12